**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Southern Division)**

| | | |
|---|---|---|
| JEREMY SCHULMAN | : | |
| 6116 Executive Blvd. | : | |
| Suite 425 | : | |
| Rockville, Maryland 20852 | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Civil Action No. _____ |
| | : | |
| UNITED STATES OF AMERICA | : | |
| U.S. Department of Justice | : | |
| 950 Pennsylvania Avenue, NW | : | |
| Washington, DC 20530-0001 | : | |
| | : | |
| Defendant | : | |

## COMPLAINT

Plaintiff Jeremy Schulman ("Plaintiff" or "Mr. Schulman"), by and through counsel, brings this complaint against Defendant the United States of America ("Defendant" or the "United States") pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–2680, and Maryland law, seeking compensatory damages for the malicious prosecution, abuse of process, intentional infliction of emotional distress, and negligent supervision and retention he suffered at the hands of the Federal Bureau of Investigation ("FBI") and its now-former Special Agent Nanette Schumaker ("Agent Schumaker")—an investigative or law enforcement officer of the United States within the meaning of 28 U.S.C. § 2680(h).

On December 2, 2020, a federal grand jury in the United States District Court for the District of Maryland returned an 11-count indictment against Mr. Schulman, charging him with bank fraud, wire fraud, mail fraud, and money laundering. The indictment rested entirely on the false and misleading testimony of a single witness: Agent Schumaker. Agent Schumaker committed perjury in her grand jury presentation. Without her materially false grand jury testimony, the grand jury would have lacked probable cause to indict, and Mr. Schulman would

1

never have been charged.

Moreover, Agent Schumaker and other FBI agents who either assisted or succeeded her during the course of the case perpetuated Mr. Schulman's wrongful prosecution with a host of unlawful and improper actions, including but not limited to:

- withholding obvious *Brady* evidence,

- stifling efforts by defense counsel to obtain exculpatory classified evidence possessed by the U.S. Department of State,

- suppressing exculpatory evidence from a key witness who was allowed to flee to Canada to avoid having to testify,

- assisting in the coercion of the government's sole cooperating witness to lie in an effort to falsely implicate Mr. Schulman in that witness's document forgeries,

- facilitating a fake "foreign evidence gathering" process to justify extending the statute of limitations pursuant to 18 U.S.C. § 3293,[1]

- spoliation of evidence with respect to the government's sole cooperating witness's Blackberry device that he used during the period relevant to the Indictment, and

- facilitating misrepresentations to the Court in relation to the signing of multiple tolling orders pursuant to the Speedy Trial Act that discovery was substantially complete, when it plainly was not.

---

[1] The FBI's and DOJ's practice of making pretextual foreign evidence requests for the purpose of manipulating federal courts to agree to extend the statute of limitations pursuant to 18 U.S.C. § 3293 has been well documented. *See* Dave Michaels et al., *Dispute Over Justice Department's Use of Overseas-Evidence Requests Grows: A Former Prosecutor Goes Public with his Allegation that Such Requests are Abused*, WALL STREET JOURNAL, March 17, 2020.

Agent Schumaker and the other FBI agents involved in the case were the masters of the investigative file and actively assisted, contributed to, and/or enabled the prosecutorial misconduct outlined above.

The case against Mr. Schulman was dismissed in its entirety, with prejudice, on August 30, 2024.

Mr. Schulman alleges further as follows:

### NATURE OF THE ACTION

1.      Mr. Schulman was the target of a baseless FBI investigation under the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78dd-1 *et seq.*, that spanned more than ten years, and a sham federal prosecution led by the FCPA Unit in the Department of Justice's ("DOJ") Criminal Division that lasted nearly four years. The indictment and prosecution of Mr. Schulman improperly sought to criminalize completely lawful actions by him in the zealous and ultimately successful representation of his foreign sovereign clients—the Federal Republic of Somalia and the Central Bank of Somalia—in an asset recovery project.

2.      The unlawful actions by the FBI and DOJ grew out of Mr. Schulman's highly effective advocacy for his clients against a rogue branch of the United Nations, known as the United Nations Monitoring Group for Somalia and Eritrea. Mr. Schulman's work debunked a false and malicious report filed by the Group, led by Jarat Chopra (the "Chopra Report"), against the Somali government in 2013. The Chopra Report had sought to disrupt a donor conference in Brussels in September 2013 that was poised to bring $2 billion in assistance to the control of the fledgling Somali government. Mr. Schulman's lacerating response to the Chopra Report led to Mr. Chopra's firing by the United Nations Security Council. In obvious retaliation for Mr. Schulman's efforts, associates of Mr. Chopra convinced the FBI in 2014 to open an unwarranted criminal investigation and take on Mr. Chopra's political fight against Mr. Schulman.

3

3.      On December 2, 2020, as noted, the federal grand jury in Maryland returned an 11-count indictment (the "Indictment" or "Ind.") against Mr. Schulman, charging him with bank fraud, wire fraud, mail fraud, and money laundering. *See United States v. Schulman*, Case No. 20-cr-434 (D. Md.). The Indictment rested entirely on the false and misleading testimony of a single witness: Agent Schumaker. Without her materially false grand jury testimony, the grand jury would have lacked probable cause to indict, and Mr. Schulman would have been spared years of physical and emotional agony and near financial ruin occasioned by the fabricated Indictment.

4.      Asserting his absolute innocence throughout this ten-year ordeal, Mr. Schulman fought the baseless charges aggressively. Mr. Schulman withstood enormous pressure and coercion from both the FBI and DOJ, as they sought to prevent him from mounting a defense, concealed substantial *Brady* material, and drove up his defense costs asserting frivolous positions. Finally, just after defense counsel had uncovered and presented to the Court evidence of serious FBI and prosecutorial misconduct in their handling of the investigation, grand jury proceedings, and overall prosecution, DOJ finally relented, and on August 30, 2024, moved to dismiss with prejudice all charges against Mr. Schulman. United States District Judge Paula Xinis granted the government's dismissal motion on that same date.

5.      By then, however, the damage had been done. Mr. Schulman was in debt; he had lost scores of personal and professional relationships, investments, and lucrative business opportunities; and he had suffered multiple health ailments, including extreme anxiety. Adding insult to injury, he had been under supervised release continuously from December 2020 through August 2024, and thus his personal liberty was significantly curtailed throughout that entire time period.

6.      Mr. Schulman timely presented an administrative claim to the FBI and DOJ on July 3, 2025, as required by 28 U.S.C. § 2675(a), asserting that the actions of the FBI

constituted, among other things, malicious prosecution and intentional infliction of emotional distress. DOJ acknowledged receipt of Mr. Schulman's claim in an October 16, 2025 letter. Neither DOJ nor the FBI has made a final disposition of the claim within six months after it was filed. Pursuant to 28 U.S.C. § 2675(a), the failure to act is deemed a final denial of the claim, and Mr. Schulman is entitled to bring this action.

7.     Mr. Schulman seeks more than $30 million in compensatory damages for legal fees, costs, and expenses he incurred in connection with the Indictment; lost profits; lost investments; taxes triggered by forced liquidation of multiple investment accounts; and pain, suffering, and severe emotional distress. These damages continue to accrue on an ongoing basis.

**PARTIES**

8.     Plaintiff Jeremy Schulman is a natural person residing in Maryland and citizen of the United States.

9.     Defendant United States of America is sued pursuant to the FTCA, 28 U.S.C. §§ 1346(b), 2671–2680, as the sovereign entity liable for the tortious acts and omissions of its employees, including Agent Schumaker and other FBI agents, who at all times relevant to this Complaint were acting within the scope of their employment as FBI Special Agents and were "investigative or law enforcement officers" of the United States as defined in 28 U.S.C. § 2680(h).

**JURISDICTION AND VENUE**

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1346(b)(1), which grants the federal district courts exclusive jurisdiction over civil actions on claims against the United States for money damages for injury or loss of property, or personal injury or death, caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his or her office or employment, under

circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

11. The claims asserted herein arise under 28 U.S.C. § 1346(b)(1) and 28 U.S.C. § 2674, as well as the law enforcement proviso of the FTCA, 28 U.S.C. § 2680(h), which waives sovereign immunity for claims of assault, battery, false imprisonment, false arrest, abuse of process, malicious prosecution or intentional infliction of emotional distress committed by investigative or law enforcement officers of the United States Government. Agent Schumaker and the other FBI agents referenced in this Complaint were at all relevant times FBI Special Agents empowered by law to execute searches, seize and maintain evidence, interview and otherwise interact with witnesses, make arrests for violations of federal law, provide testimony in grand jury proceedings, and otherwise assist prosecutors in handling, disclosing, and presenting evidence in connection with a criminal proceeding, and thus qualify as "investigative or law enforcement officers" within the meaning of the statute.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1402(b) because Mr. Schulman resides in this District and because the acts and omissions giving rise to this Complaint occurred in substantial part within this District, including Agent Schumaker's false testimony before the grand jury empaneled in this District and the prosecution of Mr. Schulman in this District.

13. Mr. Schulman has exhausted his administrative remedies as required by 28 U.S.C. § 2675(a). He timely presented an administrative tort claim to the FBI on Standard Form 95, seeking $30 million in damages plus further amounts accruing following the submission of the claim. More than six months have elapsed since his claim was presented, and the FBI has failed to make final disposition of the claim. Accordingly, under 28 U.S.C. § 2675(a), the claim is deemed finally denied, and this action is properly before the Court.

**FACTUAL ALLEGATIONS**

14.     Mr. Schulman was, at all material times, a prominent international lawyer who was retained by the Federal Republic of Somalia and the Central Bank of Somalia (collectively, "Somalia") to serve as Somalia's legal counsel in connection with, among other things, the recovery of Somali sovereign assets frozen in the United States and elsewhere, investigations of the United Nations Monitoring Group for Somalia and Eritrea, and advocacy for the Somali government in connection with a series of international disputes.

15.     Mr. Schulman's representation of Somalia involved complex financial matters, was politically sensitive, and brought him into direct conflict with powerful international institutions, including the United Nations. Mr. Schulman performed this work diligently and in good faith, at the direction and under the authorization of the highest-level authorities in the Somali government, including the President of Somalia and the Governor of the Central Bank of Somalia.

16.     In connection with this representation, in 2013, Mr. Schulman's former law firm came to possess and administer approximately $12 million in Somali government funds in trust accounts and facilitated the recovery and transfer of sovereign assets on behalf of Somalia. All such activities were conducted pursuant to valid authorizations from Somali government officials with authority over the relevant assets.

17.     In addition to the asset recovery work that Mr. Schulman commenced in 2009, Mr. Schulman was engaged in 2013 by Somalia to investigate and report on what turned out to be false allegations of corruption levelled against the Somali government by the United Nations Monitoring Group for Somalia and Eritrea. After Mr. Schulman led a team of world class lawyers and forensic accountants that thoroughly debunked the Monitoring Group's claims and exposed corruption and incompetence within the Monitoring Group itself, the Monitoring Group turned its fire on Mr. Schulman and began a campaign against him, fabricating

allegations that Mr. Schulman may have been involved in bribing Somali officials to obtain the agreement to engage his firm's services for recovering frozen assets belonging to Somalia.

18.    Mr. Schulman did not engage in any misconduct whatsoever in connection with his asset recovery work, and in fact this work led in 2013 to the recovery of tens of millions of dollars in cash and gold for the benefit of Somalia, but this did not matter to the rogue United Nations agency, which had a tradition of submitting and leaking to the media false, misleading, and grossly exaggerated reports wrongly impugning the integrity of Somalis and international actors assisting Somalia.[2] True to form, the Monitoring Group proceeded to smear Mr. Schulman in a libelous report issued in 2014, and then contacted the FBI and DOJ to encourage them to open a criminal investigation of him.

19.    Significantly, the 2014 report did not contain any credible evidence of wrongdoing by Mr. Schulman, and the United Nations Monitoring Group possessed no such evidence and presented no such evidence to the FBI or DOJ. Nevertheless, without any credible reason to do so, the FBI and DOJ dutifully obliged these United Nations officials and initiated

---

[2] Among the many examples of the corruption and incompetence of the Monitoring Group, in 2014, it accused Mohamed Abukar Zubeyr of being an Al-Shabaab suicide bomber who killed himself in a well-publicized terror attack in Bosaso, Puntland. Mr. Zubeyr had absolutely nothing to do with this attack, and he was alive and well and serving as Director General of the Ministry of Constitutional Affairs for the Federal Government of Somalia. The Monitoring Group was forced to retract and apologize for this false accusation. Another example is the case of a Somali oil company executive who was falsely accused of having connections to Al-Shabaab, which accusations had to be retracted under legal pressure, with the Monitoring Group admitting it had no evidence to substantiate its accusations. This executive later became Prime Minister of Somalia. A third example is the case of a former Somali police commissioner who was wrongly accused of assisting Al-Shabaab, accusations that also had to be retracted under legal pressure. The common thread underlying these and multiple other cases was the fact that the person targeted by the Monitoring Group for baseless attack was politically prominent and aligned with political groups in Somalia with which the Monitoring Group had political disagreement. At the time the FBI, including Agent Schumaker, relied upon the word of the Monitoring Group to investigate Mr. Schulman, the FBI, including Agent Schumaker, knew or should have known of the Monitoring Group's record of unreliability and outright dishonesty, and the fact that Mr. Schulman was closely associated with a Somali president whom the Monitoring Group disagreed with politically and whose government the Monitoring Group had been attacking relentlessly.

a criminal investigation of Mr. Schulman in 2014. The investigation was led by the FBI's Baltimore field office and the Foreign Corrupt Practices Act section of DOJ's Criminal Division.

**False Testimony By Agent Schumaker Regarding The 25B
Certification and Related Authority Conferred
Upon Mr. Schulman by President Hassan Sheikh Mohamud**

20. On December 2, 2020, relying on the perjurious testimony of just one witness at the grand jury—Agent Schumaker—the FBI and DOJ obtained the Indictment. Incredibly, the essence of the Indictment was that Mr. Schulman orchestrated the recovery of Somalia's frozen cash assets on deposit at Citibank and the New York Comptroller's Office while purportedly lacking authority to do so—notwithstanding that Mr. Schulman possessed explicit authority from Somalia's President (and multiple other sources) and the U.S. State Department had issued a formal certification pursuant to Section 25B of the Federal Reserve Act recognizing the Somali President's authority to control the assets, both directly and "upon the order" of the President.

21. Accordingly, there was absolutely no legitimate evidence establishing probable cause for these charges, and, in fact, the Indictment was procured solely based on affirmative misrepresentations of material fact by the FBI agent, and the grand jury would not and could not have indicted without these lies. At the time of her false testimony, Agent Schumaker was well aware of irrefutable evidence that Mr. Schulman possessed full authority from the highest levels of the Somali government to recover Somalia's frozen assets.

22. The Indictment was also fatally flawed legally, because, as Agent Schumaker fully understood, all charges pertaining to the funds Mr. Schulman released in 2013 were foreclosed under the Federal Reserve Act. Section 25B of the Federal Reserve Act, 12 U.S.C. § 632, provides:

Whenever (1) any insured bank has received any property from or for the account

of a foreign state which is recognized by the Government of the United States, or from or for the account of a central bank of any such foreign state, and holds such property in the name of such foreign state or such central bank; (2) a representative of such foreign state who is recognized by the Secretary of State as being the accredited representative of such foreign state to the Government of the United States has certified to the Secretary of State the name of a person as having authority to receive, control, or dispose of such property; and (3) the authority of such person to act with respect to such property is accepted and recognized by the Secretary of State, and so certified by the Secretary of State to such insured bank, *the payment, transfer, delivery, or other disposal of such property by such bank to or upon the order of such person shall be conclusively presumed to be lawful and shall constitute a complete discharge and release of any liability of such bank for or with respect to such property*. (Emphasis added.)

23.    Under Section 25B, recognition of a person as the accredited representative of a foreign state means that the transfer or other disposal of subject property "*to or upon the order of such person shall be conclusively presumed to be lawful*." 12 U.S.C. § 632.

24.    On August 13, 2013, Deputy Prime Minister and Foreign Minister of Somalia Fawzia Yusuf Haji Adam sent a letter to U.S. Secretary of State John Kerry supplementing Somalia's request for issuance of a 25B certification to include Mr. Schulman as an appropriate delegate of authority with respect to Somali assets held in U.S. financial institutions for transmission to the Somali Federal Government. Significantly, this letter specifically invoked Section 25B of the Federal Reserve Act and stated that the delegation of authority to Mr. Schulman was "upon the order of" President Hassan Sheikh Mohamud, the exact language required under Section 25B to make transfers of property "conclusively presumed to be lawful."

25.    On August 12, 2013, Somali President Hassan Sheikh Mohamud sent a letter to Senior Vice President Betty Lau of the Federal Reserve Bank of New York, stating that Mr. Schulman, "for purposes of administrative convenience," has "been delegated authority on behalf of Somalia to receive, control and/or dispose of Somalia's property located in the United States, including but not limited to all property from or for the account of the Federal Republic of Somalia or the Central Bank of Somalia and its affiliates being held in any Federal Reserve

10

bank, any federally insured bank in the United States, or any other institution, and thereafter, to submit such property to the Somali Federal Government in accordance with our engagement agreement with [Mr. Schulman's then law firm] Shulman Rogers."

26.     On September 16, 2013, Deputy Secretary of State William Burns formally issued the 25B Certification in favor of President Hassan Sheikh Mohamud to recover and control all Somali assets held in banks of the U.S. Federal Reserve system or otherwise federally insured banks. The 25B Certification certified specifically that "the power and authority of President Hassan Sheikh Mohamud to receive, control, and dispose of any and all property described above is accepted and recognized by the Secretary of State."[3]

27.     In other words, the 25B Certification insulated Mr. Schulman from any liability associated with the transfer of funds held in accounts in the name of the Somali government pursuant to the 25B Certification—as the "***payment, transfer, delivery, or other disposal of such property . . . shall be conclusively presumed to be lawful***." Virtually the entire prosecution of Mr. Schulman was premised on characterizing the transfer of Somalia's assets held by Citibank and the NY Comptroller as unlawful, in express violation of Section 25B, which deems all such transfers conclusively lawful.

28.     In her testimony to the grand jury, Agent Schumaker materially misrepresented the relevant facts underlying application of Section 25B of the Federal Reserve Act, which true

---

[3] The 25B Certification references a separate certification from Somalia's Foreign Minister asserting that President Mohamud "is the sole representative of Somalia with full authority to receive, control, and dispose of any and all interests in property described above, in accordance with the terms and conditions governing the ordinary operations of those accounts." This language only reinforced President Mohamud's authority to delegate certain limited administrative powers, but not full authority over Somalia's assets, to Mr. Schulman, as is permitted under the "terms and conditions governing the ordinary operations of those accounts." Any suggestion by the FBI that the language of the 25B Certification limited President Mohamud's authority to delegate administrative tasks to Mr. Schulman was utterly false, both based on the plain text of the 25B Certification itself and based on discussions between the Somali government and the U.S. State Department in the weeks leading up to issuance of the certification, of which Agent Schumaker was fully aware.

facts would have operated as a complete bar to Mr. Schulman's indictment and prosecution.

**False Testimony By Agent Schumaker Regarding Authority Conferred Upon Mr. Schulman by President Sheikh Sharif Sheikh Ahmed and Governor Amalow**

29.     The December 2, 2020 Indictment charged Mr. Schulman with 11 substantive counts of bank fraud, wire fraud, mail fraud, conspiracy, and money laundering, specifically under 18 U.S.C. § 1349, 18 U.S.C. § 1341, 18 U.S.C. § 1343, 18 U.S.C. § 1344, 18 U.S.C. § 1956(h), 18 U.S.C. § 1957, 18 U.S.C. § 2, as well as asserting forfeiture allegations under 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(1) and (a)(2), 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c).

30.     The Indictment spanned two different time periods during which Mr. Schulman was working to secure the release of Somalia's frozen assets. During the period 2009-2011, Mr. Schulman's work was overseen by Ali Abdi Amalow ("Governor Amalow"), who had been appointed Governor of the Central Bank of Somalia prior to the country's civil war in 1991 and whose status as of 2009/2010 was baselessly disputed by the FBI and DOJ. In any event, during this period, Governor Amalow was appointed by then Somali President Sheikh Sharif Ahmed to oversee the government's efforts to recover frozen assets, and Governor Amalow in turn engaged Mr. Schulman to lead the recovery program. The power and authority of Governor Amalow was ratified by a presidential decree (described below) and multiple confirmatory letters that Mr. Schulman had obtained from senior government officials.[4]

---

[4] The documents confirming Governor Amalow's authority include: Letter from Hon. Elmi Ahmed Duale, Ambassador/Permanent Representative of Somali Republic to the United Nations, dated May 27, 2010 (confirming that Presidential Decree No. 214 grants Governor Amalow the "authority and power to recover all the national assets of the country"); Letter from Hon. Mohamed A. Omaar, Deputy Prime Minister and Minister of Foreign Affairs of Somalia, dated March 30, 2011 (confirming that "Mr. Amalow possesses full authority to act on behalf of Somalia in recovering state assets"). In turn, Governor Amalow signed various powers of attorney in favor of Mr. Schulman, the authenticity of which was confirmed in the May 27, 2010 certification letter from Ambassador Duale. Agent Schumaker was aware of these confirmatory letters and powers of attorney but neglected to present them to the grand jury.

Ultimately, however, all of the Somali assets that Mr. Schulman located in the U.S. were released in 2013 (including more than $12 million in funds on deposit at Citibank and the N.Y. Comptroller's Office, and the country's gold reserve held at the Federal Reserve Bank valued at about $20 million). By that time, a new president, Hassan Sheikh Mohamud, had taken power in Somalia, and President Mohamud reappointed Mr. Schulman to lead asset recovery efforts and fully authorized his work by signing a broad power of attorney.

31.     Based entirely on false representations by Agent Schumaker, which deceived both the grand jurors and prosecutors alike, the Indictment alleged that Mr. Schulman engaged in a scheme to fraudulently obtain control over Somali assets worth millions of dollars, purportedly using forged documents and misrepresentations to defraud financial institutions between 2009-2014.[5] The alleged forgeries were prepared by Abdiaziz Amalo, according to Agent Schumaker, ostensibly to assist Mr. Schulman in demonstrating to banks that he possessed authority to recover Somalia's frozen assets. Abdiaziz Amalo was the nephew of Governor Amalow and was assisting his uncle in his role for the Somali government.

32.     The Indictment was returned after only eighty-eight minutes of testimony by a single witness: Agent Schumaker. Agent Schumaker's testimony began at 2:48 P.M. and concluded at 4:16 P.M. on December 2, 2020. The grand jury returned the Indictment before leaving for the day. The government's presentation of evidence before the 2020 grand jury was false, misleading, and rife with misconduct in critical and material respects, all based on false and misleading statements, including outright perjury, by Agent Schumaker.

---

[5] The alleged forgeries are referred to herein as the "Alleged 2009 Fraudulent Decree Translation," "Alleged 2013 Forged PM Letter," and the "Alleged 2013 Forged POA." The government never showed that any of these documents actually were forgeries, just that the government's sole cooperator, Mr. Amalo, under coercion, stated that they were. Mr. Schulman had nothing whatsoever to do with any claimed forging or other misconduct by Mr. Amalo, and no financial institutions relied on the alleged forgeries in any event (as discussed below).

33.     Agent Schumaker failed to present to the 2020 grand jury exculpatory evidence that was presented before an earlier grand jury convened in 2017 and that would have been critical to the 2020 grand jury's decision on probable cause to indict. This includes, but is not limited to, testimony of certain witnesses including Abdelhakim Abdi (Governor Amalow's son).  These 2017 grand jury witnesses provided numerous exculpatory statements on the scope of Mr. Schulman's (and Governor Amalow's) authority as well as substantial inconsistent statements by Abdelhakim Abdi and others that go directly to the allegations contained in the Indictment. Agent Schumaker repackaged and falsely distorted these witnesses' testimony for the 2020 grand jury, asserting falsely that Mr. Schulman lacked authority and engaged in a fraud scheme when, in fact, abundant evidence showed that he did have proper authority and committed no fraud. Agent Schumaker outright lied to the grand jury about the quality and character of the evidence that she possessed.

34.     Moreover, Agent Schumaker adopted wholesale, as her own testimony to the grand jury, Abdiaziz Amalo's coerced and false proffer statements made to the FBI. Mr. Amalo's testimony, through Agent Schumaker, was offered as conclusory facts and *ipse dixit* statements to the grand jury without identifying conflicting and exonerating evidence.

35.     For example, Agent Schumaker consistently testified before the grand jury to the ***conclusion*** that Amalo ***and*** Mr. Schulman created forged documents. This was false. Mr. Schulman never created or knowingly participated in the creation of any forged documents. This testimony not only reflected the improper legal conclusion by the government's agent, but also failed to inform the grand jurors that Mr. Schulman denied any knowledge of Mr. Amalo's falsifications in his proffer meeting that occurred in July 2017. Agent Schumaker similarly failed to introduce critical evidence of the steps Mr. Schulman took to confirm the authority reflected in these documents, such as the multiple certifications Mr. Schulman received from other Somali officials. Judge Xinis found that witnesses such as Abdelhakim Abdi and

14

Governor Amalow provided exculpatory testimony regarding the scope of Mr. Schulman's authority, *see* ECF 308 at 19-20, yet this testimony was not presented by Agent Schumaker to the grand jury. Instead, her testimony communicated falsely that this evidence did not exist.

36.     The manner in which Agent Schumaker testified not only constituted perjury—by presenting a false purported "summary" of the evidence gathered during her investigation as her own personal account of events—but it also violated the Justice Manual: "Each United States Attorney should be assured that hearsay evidence presented to the grand jury will be presented on its merits so that the jurors are not misled into believing that the witness is giving his or her personal account." *Justice Manual*, Section 9-11.232, Use of Hearsay in a Grand Jury Proceeding.

37.     Agent Schumaker also testified falsely that Mr. Schulman lacked authority pursuant to the 25B Certification, when in fact he did possess such authority due to the appointment letter issued by the Somali President on August 12, 2013 and as stated in the August 13, 2013 letter from Somalia's Foreign Minister to Secretary of State Kerry.

38.     To more fully understand the falsity of Agent Schumaker's testimony to the grand jury, it is necessary to consider some additional background underlying Mr. Schulman's early work for Somalia. In 2009, President Sheikh Sharif Ahmed of the Transitional Federal Government of the Republic of Somalia executed a decree that bestowed certain authority on Governor Amalow. The Indictment alleged that Mr. Schulman and Mr. Amalo caused Farah Abdi, a professional translator and relative of Mr. Amalo, to create a false English-language translation of Presidential Decree No. 214 to inflate Governor Amalow's credentials. *Id*. ¶ 32. This was a false claim based on Agent Schumaker's testimony.

39.     Both Farah Abdi and Abdelhakim Abdi, Governor Amalow's son, testified before the 2017 grand jury regarding Presidential Decree No. 214. Specifically, Abdelhakim Abdi testified that the decree was legitimate. Abdelhakim Abdi further testified that the decree

15

appointed Governor Amalow as a senior advisor to the president and granted him the responsibility to collect assets. This testimony corroborated a prior statement by Abdelhakim Abdi that "[h]is father had the title of Director of Recovery Assets for Somalia (or some variation); this empowered the banks overseas to deal with his father (AMALOW) as the current official of the TFG as the banks would only accept a letter or his father's physical presence to release funds." Abdelhakim Abdi reaffirmed this testimony under oath at a hearing before the Judge Xinis on January 19, 2023. *See* Jan. 19, 2023 Hr'g Tr. at 90-91.

40.     Farah Abdi similarly testified before the 2017 grand jury that the Somali-language version of Presidential Decree No. 214 provided Governor Amalow with authority to recover Somalia's national assets.  Abdiaziz Amalo made similar representations to the FBI in an interview.

41.     Agent Schumaker engaged in willful misconduct by failing to present this exculpatory evidence to the 2020 grand jury, while simultaneously providing false and misleading testimony on this topic. Specifically, Agent Schumaker falsely testified that the Somali-language version of Presidential Decree No. 214 did not provide Governor Amalow with authority to recover the national assets of Somalia or to engage Mr. Schulman to coordinate the asset recovery project, when in fact it did.

42.     There can be no dispute that Agent Schumaker's testimony regarding the authority bestowed upon Governor Amalow by Presidential Decree No. 214 influenced the grand jury's decision to indict: it heard no other testimony regarding the authority bestowed upon Governor Amalow by the decree. The Indictment's allegations that Mr. Schulman falsely inserted a clause into the translation of the decree that "falsely described" Governor Amalow as having authority to recover the national assets of the country rose and fell with Agent Schumaker's testimony. *See* Ind. ¶ 32. So, too, did the government's allegations regarding this document being sent to and relied upon by various financial institutions depend upon Agent

Schumaker's testimony that the translated decree contained false information. *See*, *e.g.*, Ind. ¶¶ 33, 34, 38, 39, 57. There can be no doubt, given the importance of this testimony to the charges against Mr. Schulman, that Mr. Schulman was actually prejudiced by Agent Schumaker's false testimony regarding the authority given to Governor Amalow pursuant to Presidential Decree No. 214.

43.     This misconduct is further compounded by Agent Schumaker's wholesale adoption of Mr. Amalo's statements as her own purported assertions of fact—when such statements benefitted the government's case—but her failure to advise the grand jury of the numerous contradictory statements made by Mr. Amalo that would seriously undermine the grand jury's view of the charges before it. For example, Agent Schumaker presented testimony to the grand jury regarding Mr. Schulman's efforts to secure additional documentation from the Somali government regarding Governor Amalow's authority, but failed to present any testimony regarding the fact that Mr. Schulman met with President Ahmed prior to the execution of Presidential Decree No. 214 to discuss the asset recovery project; that Mr. Amalo told investigators that President Ahmed wanted Governor Amalow to be in charge of the asset recovery project; and that President Ahmed told Mr. Amalo that the authority bestowed upon Governor Amalow in the decree was sufficient to recover assets on behalf of the Somali government.

### False Testimony By Agent Schumaker With Respect to the Actions of Citibank Switzerland, the New York Comptroller's Office, and Citibank New York

44.     Critical to the Indictment's theory was the allegation that various financial institutions—including Citibank Switzerland, the New York State Comptroller, and Citibank New York—released frozen Somali assets in reliance on documents that Mr. Schulman allegedly knew to be forged or fraudulent. Agent Schumaker testified to the grand jury that these institutions relied on the purportedly fraudulent documents in releasing funds. This

testimony was materially false and was directly contradicted by the sworn statements and interviews that the FBI itself had obtained from employees of these very institutions.

45.     Citibank Switzerland. The Indictment alleged that Citibank Switzerland released funds to Mr. Schulman's prior law firm in reliance on, among other things, what the Indictment characterized as a fraudulent translation of the 2009 Presidential Decree (the "Alleged 2009 Fraudulent Decree Translation"). *See* Ind. ¶ 40. Agent Schumaker testified to the grand jury that Citibank Switzerland relied on this document in releasing the funds. This testimony was false. Government interviews of Citibank Switzerland employees demonstrated precisely the opposite. Sandra Esteves Da Silva, a senior employee, told the FBI that Citibank Switzerland released the funds based upon instructions included in an April 16, 2010 letter "which was also signed by Mr. Amalow," and that "Mr. Amalow's signature on the fax [was] needed to unblock the account." A second employee, Florence Parker, similarly testified that she compared the "signature specimen" on file with the Central Bank of Somalia's account with Governor Amalow's signature on subsequent documents in releasing assets. These witnesses made clear that Citibank Switzerland did not rely on the text of the Alleged 2009 Fraudulent Decree Translation, but rather on Governor Amalow's signature authority.

46.     New York State Comptroller. The Indictment alleged that the New York Comptroller released approximately $4.8 million in reliance on, among other things, the Alleged 2009 Fraudulent Decree Translation and Mr. Schulman's presentation of the translation. *See* Ind. ¶ 57. Agent Schumaker testified to this effect in her grand jury presentation. Agent Schumaker's testimony was contradicted by the government's own interviews of the Comptroller's in-house attorney, Wendy Reeder. Ms. Reeder stated that "Schulman's Affirmation by itself did not carry enough weight to release $4 million dollars," that the 2009 Presidential Decree "held very little weight in the Comptroller's decision to release the Unclaimed Funds," and that "[w]ithout the consular notary or the apostille the

18

NYSC could not release the funds." Ms. Reeder subsequently confirmed that the "25B certificate authorizing the President of Somalia . . . and any delegation of authority to SCHULMAN were most important" in releasing funds.

47. <u>Citibank New York</u>. The Indictment alleged that Citibank transmitted approximately $7.4 million of frozen Somali assets to Mr. Schulman's prior law firm's trust account in reliance on two early 2013 documents that the government characterized as forgeries (the "<u>Alleged 2013 Forged PM Letter</u>" and "<u>Alleged 2013 Forged POA</u>"). *See* Ind. ¶ 53. Agent Schumaker testified that Rebecca Nelson, an attorney at Citibank, relied on these documents. This too was knowingly false testimony by Agent Schumaker. Indeed, Agent Schumaker's account was expressly contradicted by the government's own interview of Ms. Nelson. Ms. Nelson never stated that Citibank relied on the Alleged 2013 Forged PM Letter and Alleged 2013 Forged POA. Agent Schumaker also failed to present to the grand jury a June 28, 2013 email from Ms. Nelson disclaiming reliance on those documents and stating that Citibank would require the 25B Certification to release assets.

48. For each of the foregoing institutional witnesses, Agent Schumaker engaged in a consistent pattern of misconduct: she failed to testify to what these witnesses actually said. Rather, Agent Schumaker testified to her own false interpretation of what she claimed those witnesses said, and the grand jury was not informed of the discrepancies. Agent Schumaker thus falsified these witnesses' testimony before the grand jury by (i) reducing their testimony to unsubstantiated hearsay, and (ii) depriving the grand jury of complete and accurate information regarding the release of funds by the relevant entities.

49. Because the 2020 grand jury heard testimony from only this one witness, and because exculpatory testimony that contradicted Agent Schumaker's false testimony was not presented to the grand jury, there can be no doubt that the grand jury's decision to indict was substantially influenced by Agent Schumaker's materially false testimony, resulting in actual

and severe prejudice to Mr. Schulman.

**Allegations Further Demonstrating Malicious Prosecution,
Abuse of Process, and Intentional Infliction of Emotional Distress**

50. Agent Schumaker knowingly and materially lied repeatedly to the 2020 grand jury and to the prosecutors who were questioning her before the grand jury. She was the only witness to testify to the grand jury. Her false testimony is necessarily what caused the Indictment to issue.

51. Without Agent Schumaker's false testimony, there was no probable cause to indict Mr. Schulman on any of the charges. At all times, Mr. Schulman actually possessed authority from the highest levels of the Somali government to assist in recovering the country's frozen assets; there was no credible evidence that Mr. Schulman falsified or participated in the falsification of any documents and in fact there existed abundant exculpatory evidence to the contrary on this topic; and the State Department's issuance of a 25B Certification rendered the transactions at issue "conclusively presumed lawful." Agent Schumaker was aware of all of these facts at the time she chose to testify falsely to the grand jury that Mr. Schulman lacked authority.

52. Malice on the part of Agent Schumaker is clear and is inferred from the stark absence of probable cause.

53. All criminal charges were dismissed with prejudice on August 30, 2024; thus, the proceeding was terminated completely in Mr. Schulman's favor.

54. Agent Schumaker's conduct was intentional, extreme, and outrageous. Committing perjury to frame a person for an 11-count federal criminal indictment, subjecting that person to the risk of decades in prison and the total destruction of his life, is beyond the pale. Agent Schumaker knew at the time of her false testimony that she was the sole witness testifying to the grand jury and the Indictment could only be issued if she made her false

statements. She also knew that immediately following the Indictment, the government would issue three defamatory press releases announcing the fake charges against Mr. Schulman,[6] with the expectation that widespread public dissemination of news of the charges would destroy Mr. Schulman's career, if not his entire life, and coerce him to plead guilty quickly to crimes that she knew she could not legitimately prove because he would then lack the financial resources and the will to fight.[7]

55.     This conduct is extreme and outrageous by any measure.

56.     There is a direct causal link between Agent Schumaker's false testimony and the severe emotional distress that Mr. Schulman suffered for nearly four years. Her testimony procured the Indictment, and the Indictment created severe emotional distress for Mr. Schulman. As a result of the Indictment and ensuing efforts by the government to

---

[6] The government's decision to issue three separate press releases was grossly excessive. Moreover, the content of the releases themselves was extremely misleading, crafted to cause maximum reputational harm to Mr. Schulman:

*Maryland Lawyer Facing Federal Indictment in Maryland for Defrauding Financial Institutions and Other Entities to Obtain Control Over More Than $12.5 Million of Somali Sovereign Assets*, Dec. 3, 2020, https://www.justice.gov/usao-md/pr/maryland-lawyer-facing-federal-indictmentmaryland-defrauding-financial-institutions-and

*Maryland Lawyer Charged with Defrauding Financial Institutions and Other Entities to Obtain Control over $12.5 Million of Somali Sovereign Assets*, Dec. 3, 2020, https://www.justice.gov/archives/opa/pr/maryland-lawyer-charged-defrauding-financialinstitutions-and-other-entities-obtain-control

The third release, issued by the IRS, appears to have been disabled, but the above two DOJ press releases remain accessible to the public. DOJ's refusal to remove these two press releases is causing Mr. Schulman to suffer ongoing reputational harm. DOJ rejected Mr. Schulman's request that the press releases be removed.

[7] As Agent Schumaker undoubtedly must have intended, scores of news outlets around the world picked up the story of Mr. Schulman's indictment, and all presented the "facts" based on the false narrative fed to the grand jury by Agent Schumaker, creating the false appearance that Mr. Schulman was a corrupt lawyer who had forged documents and stolen $12 million belonging to a poor African country. *See, e.g.*, Ann E. Marimow, *Maryland Lawyer Indicted in Scheme to Obtain Millions in Somali Government Assets*, WASHINGTON POST, Dec. 7, 2020.

mischaracterize Mr. Schulman's actions in public communications, he lost many of his professional and personal relationships, including lucrative new legal representations and other business. Most of his banking and investment accounts were forcibly liquidated, and he could not obtain new financing. He endured the extreme anxiety inherent in fearing that he could be wrongly convicted, and sentenced to decades in federal prison, at the hands of government officials like Agent Schumaker who were clearly willing to lie to prop up an otherwise totally baseless case against him. Mr. Schulman suffered various health ailments as a result of this ordeal, exacerbated by his concern for the future care and welfare of his three children (aged 18, 13, and 11 at the time of the Indictment). At the insistence of his pretrial services officer while under supervised release during the pendency of the Indictment, Mr. Schulman underwent extensive psychological therapy. He also suffered repeated panic attacks and months of debilitating abdominal pains for which he needed to obtain emergency medical attention.

### The FBI's Investigation, and Assistance with the 2020 Prosecution, Was Motivated By Political Animus and Self-Aggrandizement

57. Mr. Schulman was outspoken in his opposition to the United Nations and its overreach with respect to Somali affairs. Mr. Schulman was also closely aligned and publicly associated with Somali President Hassan Sheikh Mohamud, who was a target for attack. This legal and political stance ultimately made Mr. Schulman a target for the FBI's investigation.

58. The FBI commenced its investigation of Mr. Schulman purportedly under the FCPA in 2014, although there was utterly no evidence that Mr. Schulman had committed an FCPA violation. Upon information and belief, the FBI's investigation was motivated by a desire to target Mr. Schulman because of his high profile advocacy against the United Nations and on behalf of Somali President Hassan Sheikh Mohamud and his government, and to bolster the careers of the FBI and DOJ officials involved in the investigation.

22

59. The FBI's investigation of Mr. Schulman spanned more than ten years, from approximately 2014 through the dismissal of the Indictment in August 2024. During this extended period, the FBI and DOJ repeatedly expanded the scope and duration of the investigation despite the absence of evidence that Mr. Schulman had committed any crime.

60. In January 2017, the FBI arrested and sought the cooperation of Abdiaziz Amalo ("Mr. Amalo"), a Somali national who had been involved in the asset-recovery process. Despite the obvious possibility that material evidence, evidence of other crimes, or evidence relevant to Mr. Amalo's credibility would be contained in his mobile devices, none of Mr. Amalo's mobile devices were imaged or inspected by the government at the time of their seizure in January 2017. This failure constituted spoliation of evidence and showed a willful blindness to the truth and the possibility of discovering evidence exculpatory of Mr. Schulman.

61. The government coerced Mr. Amalo into serving as a cooperating witness. Upon information and belief, the FBI and DOJ pressured Mr. Amalo to provide false testimony implicating Mr. Schulman in document forgeries that Mr. Amalo himself had perpetrated without Mr. Schulman's knowledge. Agent Schumaker subsequently adopted Mr. Amalo's coerced and false testimony as her own purported account of the "facts" in her testimony to the grand jury.

62. The FBI and DOJ also suppressed the exculpatory testimony of a senior Somali government official, Governor Amalow, and, upon information and belief, assisted in concealing his whereabouts so that he was able to flee to Canada and escape the reach of defense counsel. One FBI agent assisting Agent Schumaker acknowledged speaking with Governor Amalow substantively during the course of the investigation but failing to document the interview with a written 302 memorandum, a serious breach of FBI protocols. Judge Xinis found the government's actions with regard to this witness to be "disturbing." *See United States v. Schulman*, ECF 308, at 50. Judge Xinis further found that the FBI's and DOJ's "investigative

lapses cannot easily be overlooked," observing that "[t]he government appeared all too willing to avoid those witnesses that would likely aid Schulman's defense." *Id.* at 51. The Court held that Mr. Schulman had been prejudiced by the government's six-year delay in bringing the Indictment, concluding that "the loss of key witness testimony is as plain as the Government's careful avoidance of the same." *Id.*

63.     The FBI and DOJ further obtained extensions of the statute of limitations through 18 U.S.C. § 3293 tolling orders by making an entirely pretextual "evidence request" to the Somali government, knowing that the Somali government likely would never respond and making virtually no effort to follow up on the request. An FBI agent assisting Agent Schumaker testified under oath, in an evidentiary hearing before Judge Xinis, to his expectation that the Somali government would not respond to the evidence request, yet the FBI knowingly still used that request as the basis for seeking the tolling orders (without disclosing this fact to the Court). The tolling orders were procured solely to extend the limitations period and maintain the investigation, not for any legitimate investigative purpose.

### The FBI Perpetuated the Prosecution of Mr. Schulman By Aiding And Abetting DOJ's Scorched-Earth Litigation Tactics and Prosecutorial Misconduct

64.     After obtaining the Indictment, the government engaged in relentless, bad-faith litigation tactics designed to prevent Mr. Schulman from mounting a defense, drive up his defense costs, and coerce him into accepting a guilty plea.  All of these tactics were aided and abetted by the FBI agents assigned to the case, and included:

- Withholding substantial *Brady* material from the defense;

- Suppressing the exculpatory testimony of a senior Somali government official and assisting in concealing his whereabouts;

- Affirmatively frustrating defense efforts to obtain exculpatory evidence, including pivotal classified evidence from the U.S. Department of State;

- Spoliating evidence with respect to Mr. Amalo's Blackberry device;

- Misrepresenting in multiple Speedy Trial Act tolling order requests that discovery was substantially complete, when it plainly was not;

- Obtaining statute-of-limitations extensions through pretextual "evidence requests" to the Somali government;

- Arguing for unreasonably narrow conceptions of the issues to justify withholding *Brady* material and blocking Rule 15 depositions; and

- Erecting every conceivable obstacle to deprive Mr. Schulman of a defense.

65.     On February 2, 2024, Mr. Schulman's defense counsel filed a Motion to Dismiss the Indictment Based on Newly Discovered Evidence of Prosecutorial Misconduct. See ECF 360. Several months later, on August 30, 2024, DOJ moved to dismiss with prejudice all charges against Mr. Schulman. Judge Xinis granted the motion on the same date. See ECF 525. The criminal proceeding terminated entirely in Mr. Schulman's favor.

### COUNT I

### Malicious Prosecution

### (Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2680(h) — Maryland Law)

66.     Mr. Schulman incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

67.     Under Maryland law, a claim for malicious prosecution requires: (1) a criminal proceeding instituted or continued by the defendant against the plaintiff; (2) without probable cause; (3) with malice, or with a motive other than to bring the offender to justice; and (4) termination of the proceeding in favor of the plaintiff.

68.     Institution and Continuation of criminal proceedings. Agent Schumaker, acting within the scope of her employment as an FBI Special Agent, instituted and procured the

criminal prosecution of Mr. Schulman by presenting materially false and misleading testimony to a federal grand jury in this District, which resulted in the return of the 11-count Indictment. But for Agent Schumaker's false testimony, the grand jury would have lacked probable cause to indict, and the prosecution would never have been initiated.

69.     Agent Schumaker and the other FBI agents assigned to Mr. Schulman's case improperly continued the prosecution of Mr. Schulman by assisting DOJ prosecutors in committing the various instances of prosecutorial misconduct detailed herein.

70.     Lack of probable cause. The Indictment was procured without probable cause. Agent Schumaker's false testimony was directly contradicted by the sworn statements, interviews, and documentary evidence in Agent Schumaker's own possession. Had the grand jury received accurate testimony, it could not and would not have found probable cause to indict Mr. Schulman.

71.     At all material times, Mr. Schulman actually possessed authority from the highest levels of the Somali government to assist in recovering the country's frozen assets; there was no credible evidence that Mr. Schulman falsified or knowingly participated in the falsification of any documents and in fact there existed abundant exculpatory evidence to the contrary on this topic; and the State Department's issuance of a 25B Certification rendered the transactions at issue "conclusively presumed lawful." Agent Schumaker was aware of all of these facts at the time she chose to testify falsely to the grand jury.

72.     Malice. Agent Schumaker acted with malice and with a primary purpose other than bringing an offender to justice. She knowingly and deliberately presented false testimony to the grand jury. Upon information and belief, she was motivated by a desire to further her career, to further the FBI's politically motivated investigation, and to target Mr. Schulman because of his advocacy adverse to the United Nations and in favor of the Somali government. The systematic falsification of evidence before the grand jury demonstrates actual malice.

73.     Agent Schumaker and the other FBI agents assigned to Mr. Schulman's case improperly continued the prosecution of Mr. Schulman by assisting DOJ prosecutors in committing the instances of prosecutorial misconduct detailed herein.  They did so within the scope of their employment by the FBI, upon information and belief, motivated by a desire to further their careers, to further the FBI's politically motivated investigation, and to target Mr. Schulman because of his advocacy adverse to the United Nations and in favor of the Somali government.

74.     Further, with regard to the "malicious intent" element of a malicious prosecution claim, malice may be inferred when the indictment lacks probable cause and the law enforcement officer lied to assist in procuring the indictment. *Okwa v. Harper,* 360 Md. 161, 189, 757 A.2d 118 (2000).  The Indictment lacked probable cause, and Agent Schumaker lied to assist in procuring the Indictment, as detailed herein.

75.     <u>Favorable termination</u>. The criminal proceeding terminated entirely in Mr. Schulman's favor when, on August 30, 2024, DOJ moved to dismiss with prejudice all eleven counts of the Indictment. A dismissal with prejudice constitutes a favorable termination for purposes of a malicious prosecution claim.

76.     As a direct and proximate result of the FBI's malicious prosecution, Mr. Schulman has suffered damages in an amount to be proven at trial, but not less than $30,000,000.

## COUNT II

### Abuse of Process

**(Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2680(h) — Maryland Law)**

77.     Mr. Schulman incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

78.     Under Maryland law, abuse of process requires: (1) the use of process against

another; (2) primarily to accomplish a purpose for which the process was not designed; and (3) resulting damage.

79.    Agent Schumaker and the FBI used the grand jury process—designed to determine whether probable cause exists—primarily to accomplish purposes for which the process was not designed: (a) furthering a politically motivated investigation; (b) destroying Mr. Schulman's career, livelihood, and reputation; (c) coercing a guilty plea on fabricated charges; and (d) advancing Agent Schumaker's career within the FBI.  Agent Schumaker and the other FBI agents assigned to Mr. Schulman's case further abused the litigation process during the course of the prosecution by assisting DOJ prosecutors in committing prosecutorial misconduct.  They did so, not to serve legitimate ends, but to drive up Mr. Schulman's defense costs, destroy his career so that he could not afford these heightened defense costs, and ultimately to coerce Mr. Schulman to enter an unjustified guilty plea.

80.    The government's post-Indictment conduct confirms the abusive nature of the prosecution: withholding *Brady* material, blocking depositions, suppressing exculpatory witnesses, misrepresenting the status of discovery, and erecting every conceivable obstacle to Mr. Schulman's defense. The abuse of 18 U.S.C. § 3293 tolling provisions—through pretextual evidence requests to the Somali government—constitutes a further misuse of legal process for an improper purpose.

81.    As a direct and proximate result of the FBI's abuse of process, Mr. Schulman has suffered damages in an amount to be proven at trial, but not less than $30,000,000.

### COUNT III

### Intentional Infliction of Emotional Distress

### (Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2680(h) — Maryland Law)

82.    Mr. Schulman incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

28

83.    Under Maryland law, intentional infliction of emotional distress requires: (1) the defendant's conduct was intentional or reckless; (2) the conduct was extreme and outrageous; (3) there was a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress was severe.

84.    Intentional or reckless conduct. Agent Schumaker deliberately presented false testimony to the grand jury, knowing that the testimony was contradicted by the evidence in her own files. Her conduct was not the product of negligence or mistake; it was a deliberate act designed to procure an indictment against a man she knew was innocent. Agent Schumaker and the other FBI agents assigned to Mr. Schulman's case further acted intentionally or recklessly during the course of the prosecution by assisting DOJ prosecutors in committing prosecutorial misconduct.

85.    Extreme and outrageous conduct. Agent Schumaker used the immense power of the federal government to fabricate charges against an innocent man, subjecting him to a nearly four-year prosecution with the goal of destroying his finances, his marriage, his health, his career, and his reputation. She systematically lied under oath to a grand jury, presenting a false narrative contradicted by the government's own evidence. The government then compounded this outrage through relentless bad-faith litigation tactics, materially assisted by Agent Schumaker and the other FBI agents assigned to the case. Targeting a lawyer for his political affiliations, fabricating evidence before a grand jury, suppressing exculpatory evidence, and deploying scorched-earth tactics to prevent the truth from emerging is the very definition of extreme and outrageous conduct.

86.    Causal connection. Agent Schumaker's false testimony was the direct and proximate cause of the Indictment and the ensuing prosecution, which in turn was the direct and proximate cause of Mr. Schulman's severe emotional distress. The post-Indictment conduct by the FBI agents assigned to Mr. Schulman's case unnecessarily prolonged Mr.

29

Schulman's severe emotional distress.

87.   <u>Severe emotional distress</u>. Mr. Schulman has suffered severe emotional distress, including anxiety, depression, humiliation, mental anguish, and related physical ailments.

88.   As a direct and proximate result of the FBI's outrageous conduct, Mr. Schulman has suffered damages in an amount to be proven at trial, but not less than $30,000,000.

## COUNT IV

### Negligent Supervision and Retention

### (Federal Tort Claims Act, 28 U.S.C. § 1346(b) — Maryland Law)

89.   Mr. Schulman incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

90.   The FBI owed a duty to reasonably supervise Agent Schumaker and the other FBI agents assigned to the investigation and prosecution of Mr. Schulman. The FBI knew or should have known that Agent Schumaker was presenting false testimony to the grand jury, was suppressing exculpatory evidence, and was conducting the investigation in a manner designed to target Mr. Schulman rather than to pursue a legitimate law enforcement objective. The FBI knew or should have known that the other FBI agents assigned to the case were actively assisting DOJ prosecutors in committing serious acts of prosecutorial misconduct in violation of Mr. Schulman's constitutional and statutory rights, and that these acts were taken in a manner designed to target Mr. Schulman rather than to pursue a legitimate law enforcement objective.

91.   The FBI negligently failed to supervise Agent Schumaker and the other FBI agents assigned to the case and failed to take reasonable steps to ensure that the investigation and prosecution of Mr. Schulman were conducted lawfully and in good faith. The FBI further negligently retained Agent Schumaker and the others in their roles as case agents despite knowing or having reason to know of their misconduct.

92.     As a direct and proximate result of the FBI's negligent supervision and retention, Mr. Schulman has suffered damages in an amount to be proven at trial, but not less than $30,000,000.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Jeremy Schulman respectfully requests that this Court enter judgment in his favor and against Defendant the United States of America, and grant the following relief:

A.     Compensatory damages in an amount not less than $30,000,000;

B.     Pre-judgment interest at the applicable rate from the date of injury;

C.     Post-judgment interest as provided by law;

D.     Costs of suit; and

E.     Such other and further relief as this Court deems just and proper.

Dated: June 26, 2026

Respectfully submitted,

**STEIN SPERLING BENNETT DE JONG DRISCOLL PC**

By:     _/s/ Jeffrey M. Schwaber_
Jeffrey M. Schwaber MD Fed. Bar 06095

By:     _/s/ Deanna L. Peters_
Deanna L. Peters MD Fed. Bar 15674
1101 Wootton Parkway, Suite 700
Rockville, Maryland 20852
Tel: (+1) 301-340-2020
Fax: (+1) 301-354-8110
jschwaber@steinsperling.com
dpeters@steinsperling.com

*Counsel for Plaintiff Jeremy Schulman*

**MADAIO EYET & ASSOCIATES, LLP**
Michael T. Madaio*
Matthew T. Eyet*
1430 US Highway 206
Bedminster, New Jersey 07921
Tel: (+1) 908-869-1188
Fax: (+1) 908-450-1881
mmadaio@me-firm.com


*\*pro hac vice* application to be filed